CLERK OF COURT
Date: July 17, 2026
Signature of Clerk or Deputy Clerk: _____

U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

2026 JUL 21 P 12: 49

CLERK OF COURT

# United States District Court

## For the Eastern District of Wisconsin

KWESI B. AMONOO,

Plaintiff,

v.

EATON MANUFACTURING,

Defendant.

Case No.: **26-C-1272**

## Civil Complaint and Jury Demand

Plaintiff Kwesi B. Amonoo ("Plaintiff"), proceeding pro se, brings this Civil Complaint against Defendant Eaton Manufacturing ("Defendant" or "Eaton"), alleging severe violations of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA), resulting in a forced constructive discharge. In support of his claims, Plaintiff respectfully states as follows:

## I. Jurisdiction and Venue

1. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the claims asserted herein arise under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, and unlawful employment practices giving rise to Plaintiff's claims occurred at Defendant's manufacturing facility located within the Eastern District of Wisconsin.

3. Plaintiff has satisfied all administrative prerequisites to filing suit. Plaintiff timely filed an administrative charge with the Equal Employment Opportunity Commission (EEOC) under

Inquiry No. 443-2025-04432 on March 24, 2026, within 300 days of the unlawful employment acts.

## II. Parties

1. Plaintiff Kwesi B. Amonoo is an adult resident of the State of Wisconsin, residing at 6653 W. Chambers St., Milwaukee, WI 53210. Plaintiff is a skilled industrial and manufacturing professional. At all times relevant, Plaintiff was an "employee" as defined by 42 U.S.C. § 2000e(f) and 42 U.S.C. § 12111(4).

2. Defendant Eaton Manufacturing is a major industrial segment and subsidiary operation of Eaton Corporation plc, a massive multinational intelligent power management corporation. Defendant maintains manufacturing infrastructure within the State of Wisconsin. At all times relevant, Defendant was an "employer" engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(b) and 42 U.S.C. § 12111(5).

3. Defendant Eaton Corporation plc operates on a global scale, maintaining an extensive workforce of approximately 97,000 total employees. Financially, the corporate enterprise possesses vast economic power, generating annual revenues of $27.4 billion for the 2025 fiscal year, with trailing 12-month revenue of $28.5 billion as of early 2026, and an annual net income of $4.087 billion.

## III. Statement of Facts

### A. Compensation, Timing, and Disparate Treatment in Training

1. Plaintiff was hired by Defendant Eaton in early March 2025, executing his formal offer letter via DocuSign on March 5, 2025, and initiating onboarding on March 6, 2025.

2. Pursuant to the terms of employment and standard shift differentials, Plaintiff's base rate of compensation was established at $28.00 per hour, with an agreed-upon overtime premium rate of $42.00 per hour (time-and-a-half) for all hours worked on Saturdays, and a premium rate of $56.00 per hour (double pay) for all hours worked on Sundays.

3. Despite his extensive qualifications, Plaintiff was the only individual in his third-shift hiring class of four winders to be intentionally diverted from immediate winding machine training. While two other newly hired winders were placed directly on winding machines, Plaintiff was reassigned to the "Kitting" department.

4. Management explicitly promised Plaintiff that the Kitting assignment was a temporary, two-week orientation to learn components before attending Winding School. Instead, Defendant isolated Plaintiff in Kitting for nearly three months and never enrolled him in Winding School.

5. Defendant further subjected Plaintiff to disparate treatment by forcing him to undergo an arbitrary winding competency "test" that his peers in the same hiring class were not required to take.

## B. Religious and Sexual Hostile Work Environment

1. During his employment, Plaintiff was subjected to a continuous campaign of severe and pervasive harassment by his direct trainer, Moses, which spanned approximately 11 to 14 weeks.
2. During Week 1, Plaintiff notified the Overall Trainer, Carlos, that Moses was playing Christian music and recorded sermons continuously. Plaintiff explicitly informed Carlos during Week 2 that he is not a Christian, but rather a member of the Five-Percent Nation (Nation of Gods and Earths), and that he found the specific audio content—which discussed women being "witches" and "pronouncing death on women"—to be deeply offensive and hostile. Carlos failed to escalate the matter or take remedial action.
3. All relevant staff and management were fully aware of Plaintiff's culture and beliefs through his explicit verbal statements and a visible tattoo on his arm.
4. In addition to religious harassment, the trainer Moses engaged in highly disturbing and graphic sexual harassment. Moses continuously initiated explicit discussions regarding pedophilia, the rape of 11-year-old girls, a stated personal preference for 18-year-old girls, and acts of sexual violence. Moses also attempted to force Plaintiff to view an explicit video of a second-shift female coworker "twerking" in her underwear. Plaintiff rejected this and reported it to management.
5. Furthermore, Supervisor John Kafura engaged in predatory and intimidating behavior, regularly "leering" at Plaintiff and a white female winder, and appearing directly behind Plaintiff's workstation without announcing his presence. This conduct was witnessed by coworker James Newton and other staff.
6. During Week 5, Plaintiff explicitly complained to Supervisor Ger regarding the continuous religious broadcast and Moses's graphic discussions of sexual violence. Supervisor Ger refused to reassign Plaintiff's trainer, stating the issue was entirely "personal" and told them to "work it out." During Week 6, Plaintiff escalated the hostile environment to Human Resources (HR) Representative Dylan, but no effective action was taken.

## C. Disability Discrimination and Failure to Accommodate

1. Plaintiff has a documented 5% Permanent Partial Disability (PPD) rating affecting his right hand, elbow, shoulder/neck, and lower back, resulting from a prior workplace injury. Defendant had notice of these physical limitations.
2. On or about August 11, while Plaintiff's alternative trainer, Chris, was absent, Defendant's supervisors forced Plaintiff out of his winding duties and into Kitting, requiring him to perform an 8-hour shift of repetitive heavy mold-lifting. This assignment directly

aggravated and re-injured all four of Plaintiff's PPD-affected areas.

3. On August 12, Plaintiff presented his written medical restrictions to Supervisor Ger. Supervisor Ger explicitly refused to engage in the interactive process, stating: "Eaton don't honor no doctor's note," and flatly denied Plaintiff a light-duty accommodation.

4. When Plaintiff subsequently refused to perform heavy lifting in Kitting to protect his health, Supervisor Ger threatened him, stating the alternative was to "mess with your pockets," and penalized Plaintiff by sending him home with only half-shift pay, while a newly hired winder was given the light-duty assignment Plaintiff was denied.

## D. Retaliation, Training Sabotage, and Constructive Discharge

1. In addition to reporting harassment, Plaintiff engaged in protected activity by opposing sex-based discrimination when a coworker in Kitting, "Big Jon," referred to a female coworker, Nadia, using an offensive gender-based slur ("his bitch"). Plaintiff actively challenged the slur.

2. Immediately following this opposition, Kitting staff and Supervisor John Kafura targeted Plaintiff. During Week 7, Plaintiff was issued a fraudulent write-up for an "improper attachment" on a machine that Moses had operated. Plaintiff refused to sign the fraudulent document.

3. During Week 8, following a single minor weld mistake, Supervisor Ger and Supervisor Kafura forced Plaintiff to completely restart his entire weld training. No other newly hired winder was subjected to a "starting over" penalty for a single training error.

4. During Week 9, HR Representative Dylan assigned Plaintiff to a new trainer, Chris; however, Supervisor Kafura subverted this instruction by directing Chris to "defer to Moses," forcing Plaintiff back under the control of his primary harasser.

5. During Week 12, Big Jon and Supervisor Kafura manufactured a completely fraudulent "botched kit" report for a kit Plaintiff never filled. Bypassing Plaintiff's regular chain of command, they used a "stranger" supervisor to try to force Plaintiff to sign a retaliatory disciplinary write-up. Plaintiff refused to sign and informed Supervisor Kafura he was being intentionally set up for failure.

6. Approximately two weeks prior to Plaintiff's forced resignation, Defendant's retaliatory campaign escalated to overt training sabotage when Supervisor Ger and an unnamed Eaton safety official actively fabricated a failed "safety test" regarding a physical evaluation that Plaintiff was never actually administered or allowed to take.

7. As a bad-faith pretext for this failure, the safety official claimed that while walking past Plaintiff's designated work area, he allegedly observed Plaintiff interacting with his cellular phone.

8. This accusation was completely contradictory to established facility culture and management-approved standards, as local supervisors had explicitly authorized Plaintiff to bring personal Bluetooth speakers into the facility to play music during his shifts, an

operational reality that inherently required brief interactions with a device to manage audio tracks.

9. Despite knowing that Plaintiff was fully permitted to utilize his device for this purpose, and despite full knowledge that no physical safety examination had actually occurred, Supervisor Ger knowingly honored and enforced the fraudulent "failed" safety test to halt Plaintiff's progression.

10. Plaintiff escalated these continuous issues to HR Representative Dylan. HR Dylan failed to investigate the sabotage, labeled Plaintiff's demand for professional standards as "arrogance," and explicitly told Plaintiff to "dial back your intelligence" and "dial back your education."

11. Due to the psychological and physical toll of the unremitting harassment and medical neglect, Plaintiff was forced to seek a medical break via Sedgwick in August 2025. The company-contracted psychiatrist concluded that the environment at Eaton directly triggered Plaintiff's distress and explicitly advised Plaintiff that because Eaton's toxic climate would not change, he should quit for his own well-being.

12. Bound by the objective intolerability of the workplace, the denial of medical accommodations, and the explicit advice of the medical professional, Plaintiff was forced to submit his resignation on August 20, 2025, resulting in an unlawful constructive discharge. Plaintiff provided comprehensive documentation of the entire pattern of harassment to two female HR managers during his exit interview.

## IV. Legal Claims and Counts

### Count I: Hostile Work Environment & Religious Harassment (Title VII)

1. Plaintiff realleges and incorporates paragraphs 1 through 34 as if fully set forth herein.

2. Plaintiff is a member of a protected class based on his religion/creed as a member of the Five-Percent Nation.

3. Plaintiff was subjected to unwelcome, severe, and pervasive religious harassment via the non-stop imposition of Christian radio programming and sermons advocating violence ("death on women") after making explicit objections to management.

4. Under prevailing Seventh Circuit precedent, including *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997), employees have a clear right to be free from an environment of religious indoctrination. Forcing an objecting employee to endure continuous religious broadcasts constitutes a violation of Title VII.

5. Defendant had actual and constructive notice of the harassment through numerous complaints to multiple supervisors and Human Resources, but completely failed to take prompt and effective remedial action, thereby creating an abusive working environment.

## Count II: Hostile Work Environment & Sexual Harassment (Title VII)

1. Plaintiff realleges and incorporates paragraphs 1 through 39 as if fully set forth herein.
2. Plaintiff was subjected to unwelcome, highly offensive, and severe verbal and visual sexual harassment by his trainer, including explicit descriptions of sexual violence, pedophilia, and attempts to force Plaintiff to view explicit videos of a female coworker.
3. This harassment, combined with the predatory supervisor "leering" from John Kafura, altered the conditions of Plaintiff's employment and created an objectively hostile, degrading, and abusive work environment.
4. Defendant is liable for the harassment because management actively refused to reassign Plaintiff away from his harasser, telling Plaintiff to "work it out" personally.

## Count III: Disability Discrimination & Failure to Accommodate (ADA)

1. Plaintiff realleges and incorporates paragraphs 1 through 43 as if fully set forth herein.
2. Plaintiff is a qualified individual with a disability within the meaning of the ADA, possessing a documented 5% PPD rating that limits major life activities involving heavy lifting and repetitive manual tasks.
3. Defendant was fully aware of Plaintiff's medical restrictions but intentionally forced him into heavy labor that exacerbated his injuries.
4. Defendant flatly refused to engage in the mandatory interactive process required under the ADA, with Supervisor Ger explicitly stating that Eaton does not honor doctor's notes. Defendant denied Plaintiff light-duty accommodations while simultaneously granting them to non-disabled peers, and retaliated against Plaintiff financially by cutting his pay when he sought protection for his disability.

## Count IV: Retaliation & "Cat's Paw" Liability (Title VII)

1. Plaintiff realleges and incorporates paragraphs 1 through 47 as if fully set forth herein.
2. Plaintiff engaged in protected activities under Title VII by opposing a severe sex-based slur against a female coworker and by repeatedly reporting religious and sexual harassment to management and HR.
3. Immediately following his protected disclosures, Defendant's supervisors and staff subjected Plaintiff to a continuous pattern of adverse employment actions, including fraudulent machine write-ups, wiping out training progress, and fabricating a fraudulent failed safety test.
4. Under the "Cat's Paw" doctrine established in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), Defendant is legally liable for the retaliatory actions of its supervisors and staff who manufactured fraudulent records and sabotaged Plaintiff's training with the specific intent to cause his separation from the company.

## Count V: Unlawful Constructive Discharge

1. Plaintiff realleges and incorporates paragraphs 1 through 51 as if fully set forth herein.
2. Defendant intentionally permitted and exacerbated a working environment so physically hazardous, psychologically abusive, and hostile that a reasonable person in Plaintiff's position would feel compelled to resign.
3. Under established law, a resignation constitutes an unlawful constructive discharge when the employer ignores severe harassment, explicitly denies federal medical accommodations, and effectively communicates to the worker that their career track has been frozen or sabotaged. This forced departure constitutes an adverse employment action equivalent to an outright termination.

## V. Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant Eaton Manufacturing, granting the following relief:

1. A declaratory judgment that Defendant's conduct violated Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act;
2. An award of back pay calculated at Plaintiff's base rate of $28.00 per hour, with Saturday work calculated at $42.00 per hour, and Sunday work calculated at $56.00 per hour, to compensate for lost wages from the date of the constructive discharge to the date of judgment;
3. An award of front pay in the absolute numerical amount of $116,480.00, representing two full operational years of forward-projected salary (based on 2,080 annual regular hours at the base rate of $28.00 per hour) to ensure full financial restitution where reinstatement is impossible due to the toxic environment;
4. An award of compensatory damages for past and future emotional distress, mental anguish, loss of enjoyment of life, and physical exacerbation of injuries caused by Defendant's unlawful practices;
5. An award of punitive damages against Defendant, evaluated relative to Defendant's massive financial profile as an industry leader utilizing a workforce of 97,000 employees, with gross annual revenues of $27.4 billion and $4.087 billion in net income, to ensure the penalty carries real deterrent effects against future civil and human rights violations;
6. An award of all costs of this litigation; and
7. Such other and further relief as this Court deems just, equitable, and proper.

## Jury Demand

Plaintiff Kwesi B. Amonoo hereby demands a trial by jury on all counts and issues so triable in

this action.

Dated this 20th day of May, 2026.

Respectfully submitted,

**Kwesi B. Amonoo**, *Pro Se*
6653 W. Chambers St.
Milwaukee, WI 53210
Phone: (414) 229-9252
Email: kwesibamonoo77@gmail.com